IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

CHAD & SHARRY GRASMICK, on their
own and on behalf of A.G., a minor,

                    Plaintiffs,

          v.                                        Case No. 3:12-cv-00023-TMB

MATANUSKA SUSITNA BOROUGH
SCHOOL DISTRICT, STATE OF ALASKA
DEPARTMENT OF EDUCATION, LUCY
HOPE, DALE SWEESTER, DON ENOCH,
SCOTT DAUGHARTY,

                    Defendants.

**ORDER**

Plaintiffs Chad and Sharry Grasmick ("the Grasmicks"), on their own and on behalf of

A.G., their minor son, move for summary judgment in this action consolidating their four

administrative appeals under the Individuals with Disabilities Education Act ("IDEA").[1]  The

Matanuska School District ("the District") opposes this motion.[2]  For the reasons stated below,

Plaintiff's motion for summary judgment at Docket 93 is **DENIED**.

## I.      BACKGROUND

The District has been providing special education and related services to AG since he was

a small child.  AG suffers from dystonia, a progressive neuromuscular disease that makes his

muscles spasm painfully; his disabilities are "involved and complex" and affect his ability to

---

[1] Dkt. 93.

[2] Dkt. 94 at 2 ("None of the Plaintiff's arguments on appeal appear to relate to the State and,
hence, the State has ceded the 50 pages allotted for response, to the District.").

communicate.[3]  Until the 2008-2009 school year, AG's services were provided in school.[4]  The following school year, the Grasmicks went to Pittsburg for AG to receive medical treatment.[5]

When AG returned from Pittsburg, he received homebound placement and Extended School Year ("ESY") services from the District throughout the summer of 2010.[6]  During that period, the team tasked with formulating AG's Individualized Educational Program ("IEP") evaluated his changed needs given the time that had passed since they last worked with him; this included observation and evaluation by AG's service providers and formal occupation and physical therapy assessments.[7]

On August 13, 2010, the District held a meeting to learn about AG's needs and "get an update from the people that knew him best, his parents . . .."[8]  The Grasmicks were invited to this meeting but did not attend.[9]  On August 31, 2010, the IEP team held a meeting to discuss AG's IEP.  The Grasmicks objected to this meeting because they had only recently received the draft IEP; the District agreed to set another meeting date.[10]

---

[3]  Case 11-04/12-01, Master Pleading Binder, Tab 85 at 5.

[4]  *Id.* at 6.

[5]  Case 11-04, Transcript at 1231-43.

[6]  *Id.* at 1231-41.

[7]  *Id.* at 1239-41, 283-84.

[8]  Case 12-01, Transcript at 411-12.

[9]  *Id.*

[10]  *Id.* at 414.

On October 14, 2010, the District held another meeting to discuss the implementation of AG's IEP.[11] The Grasmicks were given Prior Written Notice of this meeting on September 23, 2010 and participated in the meeting by phone.[12] During the meeting, Dr. Brandy, one of AG's physicians, told the IEP team that shorter sessions were more appropriate for AG due to fatigue concerns.[13] The Grasmicks then insisted that the District give them Prior Written Notice that the District would hire Maxim Nursing Services to work with AG.[14] When the District did not immediately respond to the Grasmicks' demand, the Grasmicks refused to participate further and ended the phone call.[15]

On October 15, 2010, the IEP team provided the Grasmicks with written notice that they would be implementing the prepared IEP.[16] For language arts or social studies special education, the IEP arranged for 90 minutes of services at home by a special education aide five times per week, 45 minutes at home with supervision by a special education teacher once per week, and additional supervision by, and collaboration with, a teacher outside the home. For math/science

---

[11] Case 11-04, Transcript at 1235.

[12] Case 11-04, District Ex. 10025 at 34.   The Grasmicks had previously been unresponsive to attempts to set a meeting date. Case 11-04, Transcript at 286.

[13] Case 11-04, District Ex. 10025 at 17.

[14] Case 11-04, Transcript at 219.

[15] *Id*. at 287 (the District offered the Grasmicks four or five alternate dates to continue the meeting, but the Grasmicks simply ended the phone call).

[16] *Id.*; *See also* Case 11-04, District Ex. 10025 at 33.

special education, the IEP provided for the same services, with the exception that the in-home services by a special education aide five times per week were to last 60 minutes.[17]

The IEP also provided the following services: 90 minutes with a speech pathologist once per week; 120 minutes with a Physical Therapist once per week; 120 minutes with an Occupational Therapist once per week; 90 minutes with an Assistive Technology Specialist twice per month; 90 minutes with a Visually Impaired Teacher twice per month; and 6 hours of nursing services five days per week.[18] In total, AG's IEP provided 750 minutes of special education per week, 420 minutes of related services per week, and 630 minutes of nursing services per week.[19] The implemented IEP differed from the draft IEP because it incorporated the Grasmicks' concerns.[20]

Numerous special education staff members assigned to AG pursuant to the IEP testified about their experiences working with the Grasmicks. For example, Larry Burton ("Burton") was assigned as a homebound special education teacher who testified that working with AG was the most difficult placement in his "30-some-odd years" of teaching.[21] On occasion, the Grasmicks would meet Burton at the door to inform him not to provide services that day because they had a

---

[17] Case 12-01, District Ex. 10025.

[18] *Id.* at 14.

[19] *Id.*

[20] Case 12-01, Transcript at 556-57.

[21] Case 11-04, Transcript at 29, 37-38.

dispute with the District.[22]  Burton stated that he would no longer be a part of AG's IEP team because "it's just too unpredictable."[23]

Brenda Kuchenbacher ("Kuchenbacher") served as AG's assistive technology specialist.[24]  Kuchenbacher testified that her relationship with AG was damaged by Ms. Grasmick's angry and "emotional response[s]" to her in AG's presence.[25]  She also testified that she was considering leaving AG's IEP team because of the unpredictability and difficulty in dealing with Ms. Grasmick.[26]

Naomi Gravdal ("Gravdal") was the physical therapist assigned to provide services under AG's IEP.[27]  Gravdal testified that her sessions with AG were often disrupted by Ms. Grasmick expressing her frustrations in a very agitated manner and that it had become a hostile work environment.[28]  Gravdal further testified that she had been turned away from the home on multiple occasions, including one time where she was kept standing on the porch for 45 minutes.[29]  During one physical therapy session, Ms. Grasmick was expressing her frustrations to

---

[22] *Id.*

[23] *Id.* at 48.

[24] *Id*. at 67-68.

[25] *Id.* at 76-78.

[26] *Id.* at 80.

[27] *Id.* at 135.

[28] *Id.* at 139-40.

[29] *Id.* at 142-44.

Gravdal and ended the session after only 15 minutes.[30]  Gravdal testified that the work environment at the Grasmicks' home made her extremely anxious, gave her a "kind of fist feeling in my gut," and that she was not sure if she would be able to remain on AG's IEP team "if the environment is not able to change."[31]  Gravdal explained that her ability to help AG was diminished by Ms. Grasmick, who "seemed to want to absorb our attention with her needs, her agenda, her concerns, during our treatment time."[32]

Jacinda Danner ("Danner") provided vision services for AG and had worked with him since elementary school.[33]  Danner testified that she never went to the Grasmicks' home alone because she did not feel comfortable doing so; she said going to the home was so stressful that she considered quitting the team, and that she had been turned away from the home and interrupted by Ms. Grasmick while providing services.[34]

Additional service providers testified in a consistent manner. Lynn Nordlund ("Nordlund"), a special education assistant, testified that the Grasmicks told her not to provide services to AG because they said she was not certified.[35]  Nordlund said that although she was willing to again provide services to AG, she was not willing to do so alone at the Grasmicks'

---

[30]  *Id.* at 144.

[31]  *Id.* at 145.

[32]  *Id.* at 154.

[33]  *Id.* at 93.

[34]  *Id.* at 95-97, 106, 111-12.

[35]  Case 11-04, Transcript at 162-63.

home because "it was just verbally abusive."[36]   Amy Ippolita ("Ippolita"), a substitute teacher with training in special education, also testified that being in the Grasmicks' home was a "highly charged situation."[37]   Dale Sweester ("Sweester"), AG's case manager, testified that multiple staff members left AG's IEP team because of the Grasmicks' behavior and at least one person left the profession entirely.[38]

On February 1, 2011, the District held a training session for AG's IEP team; the meeting was held at the Grasmicks' home per their request.[39]   Because of the Grasmicks' behavior and objections to certain members of the staff attending the meeting, it had to be rescheduled for another location with neither the Grasmicks nor AG participating.[40]

On February 25, 2011, Burton and a special education aide visited the Grasmicks' home.[41]   Without Burton's consent, the Grasmicks made a recording of the visit and later sought admission of the recording at a hearing.[42]   Nevertheless, the Hearing Officer admitted the recording and reviewed it, finding that Ms. Grasmick's testimony regarding the visit was "dramatically different than the recording of the visit itself."[43]   Ms. Grasmick testified that she

---

[36] *Id.* at 166.

[37] *Id.* at 188.

[38] *Id.* at 291.

[39] *Id.* at 295-99.

[40] *Id.* at 105.

[41] *Id.* at 1161.

[42] Case 11-04/12-01, Master Pleading Binder, Tab 85 at 4.

[43] *Id.* at 5.

avoided discussing legal issues with Burton, but that he was attempting to entrap her into arguing with him in front of AG.[44]  In contrast, the recording depicted Ms. Grasmick giving "lengthy diatribes" about legal issues involving the District and having "numerous emotional outbursts."[45] The Hearing Officer found that any stress AG felt as a result of this visit "was entirely the result of [the Grasmicks'] conduct."[46]

On February 15, 2011, the District emailed the Grasmicks to inform them that a teaching assistant would not be sent to the Grasmicks' home "[d]ue to their refusal to have a non-certified special education staff member provide services to AG."[47]  The District noted that other special education staff members would continue to provide related services and that the Grasmicks could inform the District if they wished to resume the teaching assistant services.[48]  The Grasmicks replied, stating they did not intend to refuse teaching services by all aides but gave no clear indication that they wanted those services resumed.[49]  The District explained that when the Grasmicks told the teaching assistant to leave their home, their actions constituted a refusal of teaching assistant services.[50]  On February 25, 2011, the District sent the Grasmicks a services

---

[44]  Case 12-01, Transcript at 207.

[45]  Case 11-04/12-01, Master Pleading Binder, Tab 85 at 5.

[46]  *Id.*

[47]  Case 12-01, District Ex. 10022.

[48]  *Id.*

[49]  Case 12-01, Grasmick Ex. DDD at 442.

[50]  *Id.* at 135.

calendar for March and reminded them that the teaching assistant services could resume at their request; the Grasmicks did not respond.[51]

On February 25, 2011, the District brought a due process complaint against the Grasmicks in what became Case 11-04.[52]  In its complaint, the District alleged that the Grasmicks "effectively revoked their consent" for the services provided to AG by "exhibit[ing] conduct threatening and inhibiting providers from working with the student within the home," among other things.[53]  The Grasmicks subsequently filed three separate administrative requests for hearings in what became Cases 12-01,[54] 12-02, and 12-05.  The consolidated cases before the Court have a lengthy procedural history that will not be recounted here.[55]

## II.    LEGAL STANDARD

"Children with disabilities are entitled to a free public education, and they are entitled to education designed and tailored to be appropriate to their disabilities . . .Congress enacted IDEA to ensure that children with disabilities receive a [Free Appropriate Public Education ("FAPE")]."[56]  "A child is denied a FAPE only when the procedural violation 'result[s] in the loss of educational opportunity or seriously infringe[s] the parents' opportunity to participate in

---

[51]  *Id*. at 616.

[52]  Case 11-04/12-01, Master Pleading Binder, Tab 1.

[53]  *Id.*

[54]  *Id.*, Tab 55.

[55]  The order in Case 12-02 contains over 7 pages of procedural history alone.  DEED 12-02 at 16-1323-31.

[56]  *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 793 (9th Cir. 2008);  *see* 20 U.S.C. § 1415(b)(1).

the IEP formation process.'"[57]  Procedurally, a state educational agency must evaluate a student, determine their eligibility, create an IEP, and determine the appropriate educational placement for the student.[58]  A FAPE is satisfied by "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction," but school districts are required only to provide a "basic floor of opportunity."[59]

When reviewing IDEA administrative decisions, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."[60]  "Thus, judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review."[61]

Despite the lower standard of deference, "courts should not substitute their own notions of sound educational policy for those of the school authorities which they review."[62]  "When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of

[57] *R.B., ex rel. F.B.v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007) (quoting *W.G. v. Bd. Of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992)).

[58] *see generally* 20 U.S.C. § 1414.

[59] *Board of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 200, 203 (1982);  *see also J.W. ex rel. J.E.W. v. Fresno Unified School District*, 626 F.3d 431, 439 (9th Cir. 2010).

[60] 20 U.S.C. § 1415(i)(2)(C);  *R.B., ex. Rel. F.B.,* 496 F.3d at 937.

[61] *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1471 (9th Cir. 1993).

[62] *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987).

deference accorded the hearing officer's findings increases where they are 'thorough and careful.'"[63]  A hearing officer's findings are considered "thorough and careful" when "the officer participates in the questioning of witnesses and writes a decision 'contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions.'"[64]  The plaintiff bears the burden of proving for each claim challenged that the hearing officer's decision should be reversed.[65]

## III.  DISCUSSION

The Court will first address the Grasmicks' motions to submit additional evidence.[66]  Then the Court will turn to the Grasmicks' motion for summary judgment by addressing each of the administrative appeals in turn.

### 1.  Motions to Submit Additional Evidence

In the Ninth Circuit, "evidence that is non-cumulative, relevant, and otherwise admissible constitutes 'additional evidence' that the district court 'shall' consider pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii)."[67]  However, the Ninth Circuit has also cautioned that the "determination of what is 'additional' evidence must be left to the discretion of the trial court which must be

---

[63]  *Capistrano Unif. Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 2001) (citing *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.1994)).

[64]  *R.B., ex rel. F.B.*, 496 F.3d at 942 (quoting *Park, ex rel. Park v. Anaheim Union High Sch. Dist.*, 464, F.3d 1025, 1031 (9th Cir. 2006)).

[65]  *J.W. ex rel. J.E.W.,* 626 F.3d at 438.

[66]  Dkt. 103, 112.

[67]  *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 652 F.3d 999, 1005 (9th Cir. 2011).

careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*."[68]

In one motion to submit additional evidence, the Grasmicks seek to admit an audio recording of a meeting held with the District in December 2013.[69]  The Grasmicks submitted the motion to admit this evidence after briefing on the motion for summary judgment was complete and ripe for review.  Because this recording occurred well after the four administrative hearings on appeal and relates to this past school year, it is not relevant to the administrative hearing decisions at issue here.  Accordingly, the Grasmicks motion to submit additional evidence at Docket 112 is **DENIED**.

The Grasmicks also move to enter seventeen other exhibits as additional evidence; the evidence is labeled Exhibits A through Q.[70]  Exhibits A, D, and L need not be admitted because the Plaintiff's already admitted them during Case No. 11-04; admitting the exhibits again would be redundant.[71]  Exhibit B, an email from a Disability Law Center attorney to the Grasmicks, conveys a purported offer from the District to withdraw their request for a hearing if the Grasmicks agreed to revoke consent for nursing services and teacher's aide services.[72]  The Court agrees with the District that this is inadmissible hearsay to the extent it is offered to prove the truth of the matter asserted.

---

[68] *Ojai Unified Sch. Dist.*, 4 F.3d at 1473.

[69] Dkt. 110, 112.

[70] Dkt. 103, Grasmick Ex. A-Q.

[71] *see* Case No. 11-04, Grasmick Ex. DDD, NN, and CC.

[72] Dkt. 103-2.

Exhibit C is an email from the Grasmicks to Kathy Voran "to clarify the record regarding an issue that caused deterioration in the relationship between [the District] and the parents."[73] Although the hearing officer did not make a decision based on this issue, the Grasmicks contend that the hearing officer should have considered "what contributed to the deteriorating relationship between [the District] and [the Grasmicks]."[74] The Court will admit Exhibit C to allow the Grasmicks to present a more thorough picture of their relationship with the District.

The Grasmicks seek to admit Exhibits E-H "to show the tendency of the [the District] to accuse [the Grasmicks] to excuse its own failure for AG . . . and to correct a factual error in the record."[75] They also allege that the exhibits are relevant to their retaliation claims.[76] The exhibits are a single page Extended School Year notice (Exhibit E), a single page Prior Written Notice (Exhibit F), and a nearly illegible list of assignments (Exhibit G),[77] and an Extended School Year eligibility form (Exhibit H). The Court reviewed these Exhibits and determines that they are not relevant to a retaliation claim or to show the tendency of the District to accuse the Grasmicks of anything.

The Grasmicks also seek to admit Exhibit I, a print out of a "Frequently Asked Questions" portion of the State of Alaska, Department of Early Education & Early Development

---

[73] Dkt. 103 at 3.

[74] Dkt. 109 at 4-5.

[75] Dkt. 109 at 5; *see also* Dkt. 103 at 6.

[76] Dkt 103 at 6.

[77] Regarding Exhibit G, the Grasmicks say only that "[t]he date in question is Exhibit G." Dkt. 103 at 6.

website.[78]  The webpage states: "Parents may not administer any of the state tests."[79]  This is relevant to the issue of whether or not it was appropriate for Ms. Grasmick to refuse to interpret answers to questions for AG's test.  The District has not questioned the authenticity of Exhibit I, but argues that "[a] generalized frequently asked questions page is not sufficient or appropriate information to contradict hearing testimony, particularly for the first time on appeal."[80]  The Court disagrees and will admit Exhibit I.

Exhibit J is an email from Michelle Tarin to the Grasmicks thanking them for their patience with her while she taught AG.[81]  The District opposes the email, arguing that it is a hearsay document that has not been authenticated and that it is irrelevant.[82]  The Grasmicks argue that "it should be admitted simply to address [the District's] misrepresentation that [the Grasmicks] were persistently and always unforgiving."[83]  The Court agrees that this email, Exhibit J, is inadmissible as hearsay evidence.

Exhibit K is a 2006 email from Ms. Grasmick to Sherri Bauer, a District employee, regarding a head tracker trial AG was undergoing.[84]  The Grasmicks argue that the evidence supplements the record regarding their reasonableness and level of patience with AG's lack of

---

[78]  Dkt. 103-9.

[79]  *Id.*

[80]  Dkt. 105 at 9.

[81]  Dkt. 103-10.

[82]  Dkt. 105 at 9.

[83]  *Id.*

[84]  Dkt. 103-11.

speech therapy, and that the record is incorrect that they "complained of Ms. Tarin's ability to provide services for AG or were patently unreasonable in their responses when they felt his health was at risk."[85] The Court will admit the email, Exhibit K, as evidence to allow the Grasmicks to supplement the record as to their interactions with the District.

Exhibits M and N both relate to AG's vision issues. Exhibit M is a May 1, 2012 letter from Lucy Hope to the Grasmicks discussing the Tobii C-Eye device they checked out for AG's use.[86] Exhibit N is a June 28, 2013 Interagency Low Vision Status report on AG's vision.[87] The Court agrees with the District that both these documents are from after the relevant administrative hearings, and thus were not considered by the Hearing Officers. The Court finds that the documents are not relevant to any issue on appeal and thus denies their admission.

Exhibits O, P, and Q all relate to discovery issues. Exhibit O is an email from Theresa Hennemann telling the Grasmicks that although she wasn't sure if they were requesting a copy of AG's special education file, the District was preparing it for production.[88] Exhibit P is an email to the Grasmicks notifying them that AG's IEP file was ready and asking how they would like to receive it.[89] Exhibit Q is a letter from the Grasmicks to the District requesting discovery and responding to the District's request for discovery.[90] The Grasmicks argue that these documents

---

[85] Dkt. 103 at 8.

[86] Dkt. 103-13.

[87] Dkt. 103-14.

[88] Dkt. 103-15.

[89] Dkt. 103-16.

[90] Dkt. 103-17.

are relevant to show the District's records policy. However, the Court disagrees that the documents show the District had a particular records policy. Further, it is not evident that the documents are relevant to an issue on appeal.

Accordingly, the Grasmicks motion to submit additional evidence at Docket 103 is **DENIED in part** and **GRANTED in part.** The Court does not require any additional briefing in light of the admitted evidence.

## 2.    Motion for Summary Judgment

As an initial matter, the Court will first address the Grasmicks Reply Brief for Summary Judgment at Docket 101, which was filed one day late.[91]

On September 23, 2013, this Court set a briefing schedule that ordered the Grasmicks reply brief due by December 15, 2013.[92] Plaintiffs brief was filed one day late on December 16, 2013; it was unsigned and did not note when service was provided to opposing counsel.[93] Plaintiffs then refiled their reply brief along with a motion for miscellaneous relief requesting that the Court accept their reply.[94]

In opposition, the District requests that the Court strike the Grasmicks' reply brief in its entirety.[95] Because the Grasmicks are filing *pro se*, their reply was only one day late, and the reply was due on a Sunday and filed on a Monday, the Court grants the Grasmicks' motion for

---

[91]  Dkt. 101.

[92]  Dkt. 92.

[93]  Dkt. 96, 98.

[94]  Dkt. 99.

[95]  Dkt. 104.

miscellaneous relief and accepts their late-filed reply brief. Accordingly, the Grasmicks motion for miscellaneous relief at Docket 99 is **GRANTED**.

The Court now turns to the Grasmicks' motion for summary judgment on their administrative appeals.[96] The District opposes the motion.[97]

### A.     Case 11-04

The District requested a due process hearing in Case 11-04, alleging that the Grasmicks "effectively" revoked their consent to the services provided under the IEP by refusing the services of special education staff and nursing staff and by exhibiting threatening conduct to providers working with AG.[98] The District sought "a safe and harassment free place to work," and if homebound placement was impracticable, they sought to provide services in a neutral location.[99] The Hearing Officer ruled against the Grasmicks' motion to dismiss, finding that the District properly brought a legal complaint and that there were two main questions for a hearing: (1) whether the District satisfied its burden of showing that the Grasmicks prevented the District from providing services and (2) what remedy the Hearing Office could impose.[100]

####          i.          Consent and the Grasmicks Motion to Dismiss

The Grasmicks argued that the District could not claim "that a parent has revoked consent to services and then [contest] that alleged revocation via a due process hearing request," and

---

[96] Dkt. 93.

[97] Dkt. 94.

[98] Case 11-04/12-01, Master Pleading Binder, Tab 1 at 2.

[99] *Id*. at 3.

[100]  Case 11-04/12-01, Master Pleading Binder, Tab 85 at 17.

appeal the Hearing Officer's denial of their motion to dismiss Case 11-04.[101] The Grasmicks assert that they did not revoke consent for the program in its entirety, and that they are entitled to refuse certain services.[102]

In denying the Grasmicks' motion to dismiss, the Hearing Officer noted that the Grasmicks were correct in their assertion that IDEA gives them the right to deny consent to services or revoke a previous consent.[103] If the Grasmicks had revoked consent, the Hearing Officer explained that he would lack jurisdiction to hear the District's complaint in 11-04.[104] However, the District argued that the Grasmicks "*effectively* revoked their consent," not that they "revoked consent."[105] Had the Grasmicks fully revoked consent, the District would be expressly prohibited from providing services and would not be required to provide a FAPE under the IDEA.[106] In addition, the District would be unable to request a due process hearing because it is prohibited by the IDEA.[107]

---

[101] Case 11-04/12-01, Master Pleading Binder, Tab 6 at 1; Dkt. 93 at 9.

[102] "When parents consent to 'special education', they consent in general to whatever services the IEP provides. However, this denotes *consent* to participate in program as whole, not a guarantee the student will participate even when the parents do not believe it is appropriate for them to do so, for whatever reason. Consent is not a contracted agreement to participate – it is the parents' release that the child may participate when the parent and child choose for the child to do so." Dkt. 93 at 9-10 (emphasis in original).

[103] Case 11-04/12-01, Master Pleading Binder, Tab 15 at 1.

[104] *Id.*

[105] *Id.*, Tab 1 at 2.

[106] 34 C.F.R. §300.300(b); 20 U.S.C. § 1414(a)(D)(ii).

[107] Case 11-04/12-01, Master Pleading Binder, Tab 15 at 2.

The Grasmicks, however, do not concede that they ever revoked consent to the services the District was attempting to provide under AG's IEP and continue to hold the District responsible for providing FAPE.[108]  Meanwhile, the Grasmicks argue that the District's motion should be dismissed on the basis of revocation.[109] The Hearing Officer concluded that the Grasmicks' argument would "put [the District] in a catch-22 in which it must continue to provide services, but it cannot exercise its right to a due process hearing regarding the provision of those services."[110]  The Hearing Officer found that the District's complaint, although inartfully plead, was not an attempt to revoke services or force consent from those parents.  Rather, "the complaint demonstrates that the dispute between the parties relates to the manner in which services are being provided and not whether [the Grasmicks] have in fact formally revoked consent to those services in their entirety."[111]

The Court agrees with the Hearing Officer that the Grasmicks did not formally revoke consent and therefore, the District was required to continue to provide a FAPE.  The District's complaint ultimately sought the Grasmicks' cooperation as they attempted to provide services, services which the District was statutorily required to provide because the Grasmicks had previously given consent and they had not revoked their consent.

      ii.      The Hearing Officer's Determination that the Grasmicks conduct prevented the District from providing services to AG

---

[108] *Id.*, Tab 15 at 2, 3.

[109] *Id.* at 3.

[110] *Id.*

[111] *Id.*

The Court construes a significant portion of the Grasmicks brief to be an argument that the Hearing Officer erred in his evaluation of the Grasmicks relationship with the District.[112] The Grasmicks "appeal that the [Hearing Officer] did not use any identifiable standard to evaluate the actions of his parents vis a vis the actions of the school district and the effect of each on AG receiving a FAPE."[113] They also "appeal that these false accusations [against Mr. Grasmick] should have been considered in any equitable consideration of the parties' contributions to the deterioration of the relationship."[114]

The Grasmicks do not suggest what standard the Hearing Officer should have used; nonetheless, the Hearing Officer made careful findings regarding the parties' behavior. The Hearing Officer took days of testimony and later issued a twenty-eight page written order, which is supported by ample evidence in the record.[115] The Hearing Officer took testimony from a number of witnesses, including the Grasmicks, and found that the Grasmicks' conduct was "willful interference with the District's efforts to provide services to [AG]."[116] The Hearing Officer points out that the Grasmicks genuinely believe they are engaging in nothing more than advocacy for their son, but the "testimony of the providers was credible and remarkably

---

[112]  Dkt. 93 at 17-19; *see also* Dkt. 101 at 14 ("perhaps most damaging, [the District] continued the false accusations against AG's parents during the due process hearings"); Dkt. 101 at 20 ("the [District] vilified AG's parents").

[113]  Dkt. 93 at 17.

[114]  *Id.* at 19.

[115]  Case 11-04/12-01, Master Pleading Binder, Tab 85.

[116]  *Id.* at 19-20.

consistent" in their description of the "tremendous difficulty and, at times, impossibility of [providing services to AG] given [the Grasmicks] conduct."[117]

Even taking the Grasmicks' newly submitted evidence into consideration, the Court agrees with the Hearing Officer that the overwhelming evidence shows that the Grasmicks' conduct prevented the District from providing services to AG and amounted to an effective revocation of services. Service providers Burton, Kuchenbacher, Gravdal, Danner, Nordlund, Ippolita, and Sweester testified to consistent behavior from the Grasmicks that included preventing and refusing the provision of services to AG, verbal harassment, and occasionally threatening behavior. Their testimony provides substantial evidence that numerous providers did not feel comfortable and safe providing services to AG in the Grasmicks' home, despite a dedication to and positive relationship with AG.

The Grasmicks argue that the majority of AG's service providers "testified they had once had a good working relationship with the family, and wanted to return to that relationship, and that despite the deterioration, the vast majority of the time they [were] able to provide services to AG, and [there] continued to be days where the relationship was even as friendly as it had once been."[118] The Court does not disagree that most service providers wanted to provide services to AG, indeed the testimony demonstrates the providers' dedication to AG. However, the majority of the service providers' testimony supports the Hearing Officer's determination that the Grasmicks were engaging in inappropriate behavior and preventing the service providers from effectively assisting AG.

---

[117] *Id.* at 18-20.

[118] Dkt. 93 at 5.

iii.    Remedy

After ruling in favor of the District, the Hearing Officer examined the District's proposed remedy that the Grasmicks either be ordered to cooperate with the provision of services in their home, or in the alternative, that a neutral, alternative location be selected to provide services.[119] The Hearing officer agreed that the Grasmicks' conduct prevented the District from providing services to AG pursuant to the IEP and believed that AG's services should no longer be provided in the Grasmicks' home due to the fact that the "District staff are essentially held hostage to [the Grasmicks'] overwhelming animosity toward the district."[120]  However, the Hearing Officer found that the question of whether treatment outside the home was feasible remained unresolved.[121]

The Hearing Officer noted that AG's physician, Dr. Smith, had testified that AG could not receive services outside of the home, but that there had been only minimal testimony regarding this subject.[122]  Accordingly, the Hearing Officer ordered the District to send Dr. Smith a letter soliciting her opinion as to the barriers that AG faced in receiving services outside the home and whether or not those barriers could be "overcome with appropriate safeguards."[123] The Hearing Officer further ordered that "[i]n the event Dr. Smith approves of services in an

---

[119]  Case 11-04/12-01, Master Pleading Binder, Tab 1 at 6.

[120]  *Id*., Tab 85 at 24.

[121]  *Id*.

[122]  *Id.*

[123]  *Id.* at 25.

alternative location, one or both Parent may, but are not required to be present in the facility."[124] The District was required to provide transportation to and from the alternate location. In the meantime, before Dr. Smith replied, the District was to resume AG's in-home services, and the parents were ordered not to interfere with the provision of services.[125]

While the Grasmicks "do not disagree with the [Hearing Officer] entirely," they argue that the remedy imposed by the Hearing Officer violated due process and IDEA procedure because the IEP team should be required to meet to discuss FAPE issues and the new prospective placement.[126] However, the Hearing Officer's order did not automatically change AG's placement because it first required input from Dr. Smith.[127] Further, the District was not seeking to change any of the actual services provided to AG; it simply sought to change where those services would be provided. Although the Court is sensitive to the Grasmicks' concerns, the IDEA does not require an IEP meeting to determine the location of services; location of services and placement are not synonymous under the IDEA.[128] In this way, the Grasmicks have not proven that the Hearing Officer's proposed remedy violated due process and their appeal of Case 11-04 is denied.

---

[124] *Id.* at 26.

[125] *Id.* The Hearing Officer also delineated additional conditions regarding the Grasmicks' right to revoke consent for services and guidelines for the District in the event the Grasmicks violate any provisions of the order.

[126] *See* Dkt. 93 at 21-22.

[127] Case 11-04/12-01, Master Pleading Binder, Tab 85 at 26.

[128] *Id.*

### B.     Case 12-01

In Case 12-01, the Grasmicks filed a due process complaint against the District alleging that the District brought case 11-04 against them for improper reasons and that the District did not provide them Prior Written Notice before "it withdrew a substantial portion of [AG's] services on February 15th, allegedly in response to an 'effective' revocation of consent by his parents."[129]  They claim that the District "did not provide [the Grasmicks] the opportunity to participate in a team decision to withdraw those services on February 15th, and to review the information and make alternative proposals for [AG's IEP]."[130]  They further allege that the district did not provide AG with the opportunity to be maintained in his current educational placement, and thus failed to provide him with FAPE.[131]  On appeal, they argue against all adverse determinations of the Hearing Office, particularly: that paraprofessionals should not have been teaching AG, that AG was improperly evaluated, that the Grasmicks were not given appropriate records, and that all these issues violated IDEA procedures and prevented AG from receiving FAPE.[132]

In Case 12-01, the Hearing Officer addressed the Grasmicks' claims that the District brought Case 11-04 for an improper reason.[133]  The Court agrees with the Hearing Officer that there is no evidence supporting this contention.  On the contrary, the District's staff appear

---

[129]  Case 11-04/12-01, Master Pleading Binder, Tab 55 at 7.

[130]  *Id.*

[131]  *Id.*

[132]  Dkt. 93 at 26-29.

[133]  Case 11-04/12-01, Master Pleading Binder, Tab 103 at 21.  The District had already prevailed in Case 11-04.

dedicated and committed to providing services to AG, even those who testified that they had significant problems working in the Grasmicks' home and wanted to continue providing services to AG.

As to the claim that the District violated IDEA procedures and prevented AG from receiving a FAPE, the Grasmicks first argue that they were not given Prior Written Notice that "by refusing aide services on February 15th when the alternate came, [the Grasmicks] were deemed to have refused the service completely and AG's program would be changed so that he would no longer receive those service."[134]  IDEA requires prior written notice to the parents of a child when an educational agency "proposes to initiate or change; or refuses to initiate or change the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child."[135]

Here, the District was not refusing to provide services; they expressed their willingness to provide those services to the Grasmicks if they wanted them, but the Grasmicks never replied. The District gave the Grasmicks written notice of the proposed change to AG's services as soon as they intended to take it.  The Court cannot determine whether or not the Grasmicks received notice, prior to February 15, 2011, that their refusal of those services would result in the District interpreting their actions as an effective revocation of consent.  However, the evidence demonstrates that the Grasmicks were given such notice immediately after their refusal of

---

[134]  Dkt. 93 at 28.

[135]  20 U.S.C. § 1415(b)(3)(A), (b)(3)(B).

services with the opportunity to clarify their wishes, but that they declined to notify the District that they wanted those services to continue.[136]

The Grasmicks also argue that they were not given prior written notice "that AG would not be served when the school year began until he had a new IEP . . . [and] that AG's program was recommended to be drastically reduced."[137] The Grasmicks do not submit evidence demonstrating that they were not given notice, nor is it clear that they are entitled to such notice under IDEA.

The Court also construes part of the Grasmicks' brief to argue that they were not given notice of either the IEP team's meeting on the afternoon of October 14, 2010 or of the planned development procedures and evaluations for AG's IEP, which they contend are not in compliance with IDEA.[138] The majority of the evidence shows that the District repeatedly tried to schedule meetings with the Grasmicks to discuss AG's IEP and that the Grasmicks failed to schedule or participate in a number of the meetings. In regard to the Grasmicks' claim that the District did not appropriately evaluate AG, the Court notes that the Hearing Officer's order simply says that "[t]he evidence does not support this claim. The District sought in good faith to conduct evaluations of Student."[139] The Grasmicks do not cite significant evidence in support of the apparent claim that AG was not evaluated appropriately nor do they explain the legal basis for their claim. Thus, the Court may not rule in their favor on this point.

---

[136] Case 12-01, District Ex. 10022.

[137] Dkt. 93 at 28.

[138] *Id.*

[139] Case 11-04/12-01, Master Pleading Binder, Tab 85 at 25.

Lastly, the Grasmicks appeal the Hearing Officer's determination that they were given appropriate records relevant to the IEP.[140]  The Grasmicks state that "the plain language of the statute requires that [they] be given the records relevant to the IEP prior to the IEP meeting if they request them, and [the Grasmicks] did on August 30th."[141]  However, the evidence presented to the Court shows that the Grasmicks did not request the records related to AG's IEP until November 25, 2010, well after the October 14, 2010 IEP meeting.[142]  Accordingly, the Grasmicks appeal of Case 12-01 is denied.

### C.    Case 12-02

The Grasmicks alleged in Case 12-02 that AG did not receive a FAPE under his October 2010 IEP.[143]  The Court interprets their arguments on appeal to focus on the alleged failure by the District to properly evaluate AG prior to developing his IEP, which in turn resulted in AG not receiving FAPE.[144]  The Grasmicks conclude that because AG was not properly evaluated, they "were procedurally denied the information they needed for his placement to be appropriate, but so was the IEP team.  Because the District had already decided to reduce AG's hours with an IEP meeting that involved any of this input, the only conclusion can be that the [the District] predetermined AG's IEP services to be reduced, and then searched for a way to justify it."[145]  The

---

[140]  Dkt. 93 at 29.

[141]  *Id.*

[142]  Case 12-01, Transcript at 430-37.

[143]  DEED 12-02 at 16-0004.

[144]  Dkt. 93 at 30-34.

[145]  *Id.* at 33.

Grasmicks claim that AG was not properly evaluated because the evaluations done were informal, and more specifically, that AG was not properly evaluated for Assistive Technology for an eye gaze device.[146]

As described earlier, the IDEA requires that children with disabilities be provided "a free appropriate public education (FAPE)" which requires the educational agency to evaluate the student, determine his eligibility, create an IEP, and determine the appropriate educational placement.[147]  Denial of a FAPE by a procedural violation only occurs when that violation "result[s] in the loss of educational opportunity or seriously infringe[s] the parents' opportunity to participate in the IEP formation process."[148]

After engaging in meticulously-detailed factual findings, the Hearing Officer in Case 12-02 found that prior to the 2010-2011 school year, the District attempted to evaluate AG's changed needs and that the resulting October 2010 IEP provided AG with substantive FAPE.[149] As described by the Hearing Officer in Case 12-01, the evaluation undertaken by the District "included observation and evaluation by all of Student's service providers, as well as a formal occupational therapy evaluation and a formal physical therapy evaluation."[150]  That order elaborated that "leading up to and during" school year 2010-2011, "providers with the District not only personally observed and evaluated [AG], but also conducted, or attempted to conduct,

---

[146]  Dkt. 93 at 5, 30.

[147]  *see* 20 U.S.C. § 1414;  20 U.S.C. § 1415(b)(1).

[148]  *W.G.*, 960 F.2d at 1484.

[149]  DEED 12-02 at 16-1387 (a 67 page order).

[150]  Case 11-04/12-01, Master Pleading Binder, Tab 103 at 9.

formal evaluations in the areas of occupational therapy, physical therapy, assistive technology, and academics, as well as adaptive components of evaluation, with [AG]."[151]  Although the academic evaluation was not completed, the Hearing Officer in Case 12-01 found that it was "due in part to a lack of cooperation by [the Grasmicks]."[152]  The Hearing Officer in Case 12-02 made similar findings.[153]

For example, the Assistive Technology Specialist Kuchenbacher testified that she recognized that AG was no longer able to use his voice activated communication device independently.[154]  When Kuchenbacher offered to have the District assess AG's eye gaze ability, Ms. Grasmick stated that she didn't want the District to do it and that she was working with a private practitioner.[155]  In January 2011, Kuchenbacher was then approached by the Grasmicks requesting that an Assistive Technology Evaluation be done for AG.[156]  The Grasmicks argue that an Assistive Technology Evaluation was not done until April 2011, even though they requested it in October 2010.[157]  To support this argument they cite the Assistive Technology Evaluation that was done in April 2011, but the evaluation does not say when the Grasmicks requested it.  Instead, the evaluation supports Kuchenbacher's testimony that the Grasmicks did

---

[151] *Id.* at 19.

[152] *Id.* at 20.

[153] DEED 12-02 at 16-1346.

[154] DEED 12-02 at 20-0819.

[155] *Id.*

[156] *Id.* at 20-0822.

[157] Dkt. 103 at 8.

not request the evaluation until January 2011, that consent was not provided until February 2011, and that the evaluation subsequently took place.[158]

Contrary to the Grasmicks argument that AG's services were reduced by the District for an improper purpose, testimony supports the District's explanation that it was simply trying to accommodate AG's changed needs.[159] Dr. Brandy specifically told the IEP team that AG suffered from fatigue and that shorter sessions were more appropriate for him.[160] Lucille Hope testified that the IEP team considered location, intensity, duration, and frequency when developing the IEP and that under the IEP, AG's services were "in all ways increased" from school year 2008-2009 to school year 2010-2011.[161] Under the new IEP, AG received one-on-one or two-on-one services, whereas during the 2008-2009 school year he had been receiving less intense small group instruction for the first three quarters of the year.[162] Further, the frequency of his services was increased so that AG received services on more days than he previously had.[163] This refutes the Grasmicks' claim that the District "predetermined AG's IEP services to be reduced, and then searched for a way to justify it."[164]

---

[158]   The Court also notes that Kuchenbacher explained that it was a lengthy evaluation process involving a team and the first part of the evaluation took 45 days.   DEED 12-02 at 20-822-23.

[159]   *See* Dkt. 93 at 33.

[160]   Case 11-04, District Ex. 10025 at 17.

[161]   Case 12-02 DEED 20-0977-78.

[162]   *Id.* at 20-0978-79.

[163]   *Id.* at 20-0980.

[164]   Dkt. 93 at 33.

In short, two Hearing Officers each made separate, detailed factual findings and found that AG was properly evaluated.  The Grasmicks have not shown that AG was denied a FAPE; on the contrary, AG received frequent educational and support services that were carefully designed to benefit him educationally.  Accordingly, Grasmicks have not met their burden of proving that AG did not receive a FAPE, and their appeal of Case 12-02 is denied.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment at Docket 93 is **DENIED**.  Plaintiffs' motion for miscellaneous relief at Docket 99 is **GRANTED**.  Plaintiffs motion to submit additional evidence at Docket 112 is **DENIED** and their motion to submit additional evidence at Docket 103 is **GRANTED in part** and **DENIED in part**.

Dated at Anchorage, Alaska, this 23rd day of September, 2014.

/s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE